```
 1            V. Lalane – People – Direct
 2    A.     Yes.
 3           MS. DOUGLAS:  I have no further (        ...s.
 4    Thank you, ma'am.
 5           THE COURT:  Any cross-examination?
 6           MR. BARKET:  No, Judge.  Thank you
 7           THE COURT:  Thank you, very much, Ms.
 8    Lalane.  You can take a seat.  Try to compose
 9    yourself.  We appreciate it.  Thank you.
10           (WHEREUPON, AT THIS POINT, THE WITNESS
11    STEPPED DOWN AND RESUMED HER SEAT IN THE
12    AUDIENCE:)
13           THE COURT:  People may proceed with their
14    next witness.
15           MS. HOFFMAN:  People call Police Officer
16    Theresa Wissert.
17           COURT OFFICER:  Name?
18           MS. HOFFMAN:  Theresa Wissert.
19           (WITNESS ENTERS COURTROOM.)
20           COURT OFFICER:  Step up, remain standing,
21    face the clerk.
22           THE CLERK:  Raise your right hand, please.
23    PO  T H E R E S A    W I S S E R T  #15079, was called
24         as a witness by and on behalf of the People,
25         and after having been first duly sworn by the
```

1          PO T. Wissert #15079 — People — Direct

2             Clerk of the Court, took the witness stand

3             and testified, under oath, as follows:

4                THE WITNESS:  I do.

5                THE CLERK:  All right.  Pull the chair all

6             the way up, please.

7                THE WITNESS:  Thank you.

8                THE CLERK:  Try to speak directly into the

9             microphone.  State your name, please?

10               THE WITNESS:  Officer Wissert, shield

11            number 15079, 7-3 Precinct.

12               THE CLERK:  First name?

13               THE WITNESS:  Theresa.

14               THE CLERK:  With an H?

15               THE WITNESS:  With an H.

16               THE CLERK:  Thank you.

17               THE WITNESS:  Thank you.

18               THE COURT:  You may examine the witness,

19            Ms. Hoffman.

20      DIRECT EXAMINATION

21      BY MS. HOFFMAN:

22         Q.    Thank you.  Good morning, Officer.

23         A.    Good morning.

24               MR. BARKET:  I'm sorry.  Could I ask the

25            witness just slide forward so my client and I

49

PO T. Wissert #15079 - People - Direct

can see her.

   THE COURT:  Slide another couple inches

forward, please.

   MR. BARKET:  Or to her left.  Thank you.

   THE COURT:  You may proceed.

Q.   By whom are you employed?

A.   New York City Police Department.

Q.   How long have you been employed with the New York City Police Department?

A.   Around four and a-half years.

Q.   What are your current duties and responsibilities?

A.   Right now, I'm in the Burglary Unit of the the 7-3 Precinct.  At that time, I was a patrol officer.

Q.   Officer, when you say "at that time," are you referring to December 30th, 1997?

A.   Yes.

Q.   On December 30th of 1997, were you working on that day?

A.   Yes, I was.

Q.   And in what -- as a patrol officer?

A.   Yes.  I was in Sector John, Kay, Michael.

Q.   Did you have a partner on that day?

50

1                PO T. Wissert #15079 – People – Direct

2      A.       Yes, I did.

3      Q.       What was your partner's name?

4      A.       Police Officer Coluciello.

5      Q.       Now, on that day, were you in uniform,

6      plainclothes?

7      A.       In uniform.

8      Q.       Now, I direct -- strike.  What time did you

9      work on that day?

10     A.       My tour was 0705 by 1540.

11     Q.       Starting 7:00 in the morning to go to about

12     3:00 --

13     A.       3:00 -- 3:40 in the afternoon.

14     Q.       Now, I direct your attention to,

15     approximately 3:30 in the afternoon, did you receive a

16     call to go somewhere?

17     A.       Yes.

18     Q.       What time did you receive that call?

19     A.       I believe it was 12:36.

20     Q.       And where did -- where were you directed to

21     go?

22     A.       To -- can I look in my memo book?

23              THE COURT:  You may.

24              THE WITNESS:  2187 Strauss Street.

25     Q.       What county is that in?

51

1              PO T. Wissert #15079 — People — Direct

2      A.     Brooklyn.

3      Q.     What was at 2187 Strauss Street?

4      A.     A bodega.  A gross store.

5      Q.     When you say "Brooklyn," is that Kings

6 County?

7      A.    Correct.

8      Q.     When you got to that scene, were you and your

9 partner the first, the first people to arrive, or had

10 other police officers arrived?

11      A.     No.  We were the first on the scene.

12      Q.     When you arrived, what did you see?

13      A.     When we pulled up we just saw the store and

14 then we proceeded inside the store.

15            THE COURT:  Just tell us what you saw and

16            what you did, okay.

17            THE WITNESS:  Okay.

18            THE COURT:  What's your partner's name?

19            THE WITNESS:  Officer Coluciello --

20            Officer Coluciello.

21            THE COURT:  Go ahead.

22      Q.     Now, Officer, you said that -- were there

23 people standing outside on the sidewalk when you

24 arrived?

25      A.     There was one man that approached us as we

1               PO T. Wissert #15079 — People — Direct

2     got out of the vehicle.

3       Q.      And you said that you proceeded into the

4     store?

5       A.      Um—hum.

6       Q.      What did you see, once you entered the store?

7       A.      I saw a man lying on the floor in, I believe

8     it was the first aisle.

9       Q.      Was this person lying face up or face down?

10      A.      Face down.

11      Q.      And did you notice anything else about this

12    person?

13      A.      Well, when I proceeded to go towards him,

14    he —— there was very little blood on the floor and he

15    wasn't moving.

16      Q.      Do you know where your partner went, at this

17    time?

18      A.      At that time, I believe my partner went on

19    the other side of the register.

20      Q.      So he went up to the counter area?

21      A.      He went up to the counter area.

22      Q.      And what did —— did you approach the person

23    who was lying on the floor?

24      A.      I approached the person laying in the aisle,

25    in the first aisle.

53

PO T. Wissert #15079 - People - Direct

1

2   Q.   After you observed this person lying on the

3   floor, did you call for backup?

4   A.   No.   There was a backup unit already coming,

5   so they had arrived.   I had called for an ambulance

6   and for the bosses to respond to the scene.

7   Q.   What did you do after that?

8   A.   We proceeded to check the bodega to make sure

9   there were no perpetrators on the premise, then

10  everyone, we told everyone to get out of there.

11  Q.   Who was "everyone," when you say "everyone"

12  out of the store?

13  A.   The officers that were backing us.

14  Q.   Was there anybody who was in the store that

15  was not an officer?

16  A.   Negative.   No.

17  Q.   Did you search the entire store?

18  A.   Yes, we did.

19  Q.   Did you ever see anybody else, besides an

20  officer, in that store?

21  A.   No.   Negative.

22  Q.   Did you ever see anything behind the counter?

23  A.   When I proceeded to go to the doorway, after

24  we had escorted everyone out, we stood by the door.

25  That's when I saw the other body laying by the -- on

1              PO T. Wissert #15079 - People - Direct

2       the -- by the counter.

3          Q.      Was that the store part, on that side of the

4       counter or behind the counter?

5          A.      Behind the counter.

6          Q.      Was that person laying face up or face down,

7       if you remember?

8          A.      I don't remember.

9          Q.      You said you escorted everybody else out?

10         A.      Yes.  Officers that backed us.

11         Q.      And did you secure the scene?

12         A.      Affirmative.  Yes.

13         Q.      Could you explain what that means, to "secure

14      the scene"?

15         A.      You are not to let anyone into the store and

16      you are to put -- you put up crime scene tape where

17      the boss tells you to.  It's up to him what feet and,

18      you know, what yards he wants to do the crime scene

19      at.  But no one is allowed to enter that, the crime

20      scene, that store.

21         Q.      So did you ensure that no other civilians

22      went into the store?

23         A.      No civilians or officers after that, after

24      the, after the backup team came, were allowed in the

25      store, after the boss came.

55

PO T. Wissert #15079 – People – Direct

1

2    Q.    You said "the boss came"; did, eventually,

3    other detectives come, as well?

4    A.    Detectives, bosses, chiefs.  Everyone was at

5    the scene.

6    Q.    What I would like to do, Officer, is show you

7    what's been previously marked for identification

8    purposes as People's Number 1, do you recognize what

9    this is?

10    A.    It's a diagram of the store.

11    Q.    And does this diagram fairly and accurately

12    represent the layout of the store as it appeared on

13    December 30th, 1997?

14    A.    Yes, it does.

15              MS. DOUGLAS:  At this time, I would offer

16              People's Number 1 into evidence.

17              THE COURT:  Any objection?

18              MR. BARKET:  No, Judge.

19              THE COURT:  All right.  People's 1 will be

20              received in evidence.

21              (PEOPLE'S EXHIBIT 1 MARKED IN EVIDENCE.)

22    Q.    Officer, I would ask if you could just step

23    down and just briefly point to the diagram.

24              THE COURT:  If you need to get up or move,

25              Mr. Barket, you may.  Would you just show the

56

PO T. Wissert #15079 – People – Direct

1                    members of the jury where the entrance to the

2                    store is.

3

4                        (Witness complies.)

5                        THE WITNESS:  We entered over here.  This

6                    is the entrance.

7      Q.      Let the record reflect that the witness

8    pointed to where it is says "Entrance," on the

9    diagram.  When you first came in, where is it that you

10   first saw the first -- when you first saw the first

11   victim?

12     A.      When we -- when we came in I, I immediately

13   ran to this Aisle 1, to this body over here, whereas

14   my partner, I believe, checked behind the counter and

15   was over here.

16     Q.      Then you -- thank you.  You can sit down.

17             Then you checked the rest of the bodega?

18     A.      Yes.

19     Q.      Then you secured the bodega?

20     A.      Right.

21     Q.      Now, Officer, eventually, did detectives from

22   the Crime Scene Unit come to the scene?

23     A.      Yes.

24     Q.      Yes?

25     A.      Yes.

57

PO T. Wissert #15079 - People - Direct

1

2    Q.    And how long did you stay at the scene?

3    A.    I believe I was there to about 10:00 p.m.

4    Q.    And when you -- when the Crime Scene -- did

5    you actually, yourself, physically pick up any

6    evidence?

7    A.    Negative.

8    Q.    Did you watch anybody else pick up evidence?

9    A.    Yes.   The Crime Scene detectives.

10   Q.    And once they pick up that evidence, who

11   receives that evidence, once they pick it up?

12   A.    They gave it to us and we voucher it.

13   Q.    When you say "we," who is it that you are

14   talking about?

15   A.    Me and my partner, Officer Coluciello.

16   Q.    When you say "voucher," what does that mean?

17   A.    It's for safekeeping or for, you know, arrest

18   situations, for evidence to safe-keep the evidence.

19   Q.    When you say "safe-keep the evidence" is

20   there a particular number that's assigned to that

21   particular piece of evidence?

22   A.    Yes.

23   Q.    We're talking about evidence that you watched

24   the Crime Scene detective pick up; any ballistic

25   evidence?

58

PO T. Wissert #15079 – Defendant – Cross

1

2    A.    Yes.

3    Q.    Did you safe-keep that particular evidence?

4    A.    Yes.

5    Q.    Under what voucher number did you safe-keep

6    it?

7    A.    May I refer to my --

8         THE COURT:  Yes, you may.

9         THE WITNESS:  I believe, I believe it's

10        Henry, 156511.

11   Q.    How many pieces of ballistics' evidence did

12   you receive from the Crime Scene detective?

13   A.    Two.

14        MR. BARKET:  What was the number again,

15        Judge?  I'm sorry.

16        THE COURT:  Read it again.

17        THE WITNESS:  Henry, 156511.

18        MR. BARKET:  Thank you.

19        MS. DOUGLAS:  I have nothing further.

20        THE COURT:  Cross-examination, Mr. Barket.

21   CROSS EXAMINATION

22   BY MR. BARKET:

23   Q.    Thank you.  Good morning, Officer.

24   A.    Good morning.

25   Q.    Officer, I want to ask you some questions, if

59

PO T. Wissert #15079 – Defendant – Cross

1     you recall, about the store itself.

2          The store has windows on two sides, does it

3     not; do you recall?

4     A.     Where would the windows be?  I know there's

5     windows on the Strauss Street side, but there are no

6     windows by the refrigerator, on the refrigerator side.

7     That's connected to another building.

8     Q.     Have you been back to that location, since

9     this?

10    A.     No.

11    Q.     Had you been there, prior to this?

12    A.     I believe, maybe once or -- once or twice,

13    with jobs.

14    Q.     Do you have an independent recollection of

15    the way the store looked on December 30th, 1997?

16    A.     I have a pretty good recollection, yes.

17    Q.     Have you seen some photographs of the store,

18    since then?

19    A.     Yes.

20    Q.     Okay.  District Attorneys showed you crime

21    scene photographs?

22    A.     Yes.

23    Q.     That refreshed your memory also?

24    A.     Yes.

60

PO T. Wissert #15079 — Defendant — Cross

1

2          MR. BARKET:  All right.  Judge, could I

3          approach the diagram?

4          THE COURT:  You may.

5      Q.     I want to direct your attention, if I can,

6   just so that the, if I understand this correctly, this

7   would be north, right, facing down, so the rest -- so

8   the bottom of the picture is north?

9      A.     Correct.

10     Q.     And just so that we kind of complete, east

11  would be to the left of the picture?

12     A.     Correct.

13     **Q.     West would be to the left?**

14     A.     Yes.

15     Q.     And south would be right up at the top?

16     A.     Yes.

17     Q.     Looking at the southerly portion of the store

18  there it is lined with windows; is it not?

19     A.     Right.  Yes.

20     Q.     And the easterly portion along Strauss,

21  that's also lined with windows; is that true?

22     A.     There are windows, maybe half, I believe it's

23  brick where shelves, where shelves start, that's

24  brick.

25     Q.     Now, the windows, however, did they have, on

h/c        2/7/2000

61

PO T. Wissert #15079 - Defendant - Cross

1 

2 December 30th, 1997, did they have any objects, either

3 stacked in front of them or posters on the windows

4 covering them?

5    A.    I couldn't honestly tell you that.  I don't

6 recall.

7    Q.    Would looking at photographs refresh your

8 memory?

9    A.    Yes.

10        MR. BARKET:  Do we have any of the

11        photographs?

12        MS. HOFFMAN:  Judge, we didn't bring those

13        with us.  We weren't asked to.

14        MR. BARKET:  I thought there were two.

15        MS. HOFFMAN:  That would be the outside of

16        the store.

17        MR. BARKET:  Could I take a look at the

18        two that we do have?

19        THE COURT:  Certainly.

20        MR. BARKET:  Thank you.

21        MS. DOUGLAS:  (Handing.)

22        MR. BARKET:  Thanks.  Could I have this

23        marked, Judge, as Defendant's A for

24        identification, please.

25            (Next page, please.)

62

PO T. Wissert #15079 – Defendant – Cross

1

2          (DEFENDANT'S EXHIBIT A MARKED FOR

3       IDENTIFICATION.)

4          THE COURT:  All right.  You want to show

5       it to the witness, please.

6          COURT OFFICER:  (Handing.)

7   Q.    Could I ask the witness be shown what's been

8   marked as Defense Exhibit A for identification; do you

9   recognize what that picture depicts, Officer?

10  A.    Yes.  Yes.

11  Q.    Did you observe what's in that photograph on

12  December 30th of 1997?

13  A.    Yes.

14  Q.    Does that picture fairly and accurately

15  depict what you observed at this time?

16  A.    Yes.

17          MR. BARKET:  I'd offer it into evidence,

18       Judge.

19          THE COURT:  Any objection?

20          MS. HOFFMAN:  No objection.

21          THE COURT:  Defense Exhibit A will be

22       received in evidence.  Please mark it.

23          (DEFENDANT'S EXHIBIT A MARKED IN

24       EVIDENCE.)

25          THE COURT:  Walk it in front of the jury

PO T. Wissert #15079 – Defendant – Cros:

2          box and show the jurors what that ph

3           (WHEREUPON, AT THIS POINT, DEFENDANT'S

4          EXHIBIT A WAS PUBLISHED TO THE JURY.)

5         THE COURT:  You may proceed.

6   Q.    Officer, would you take a look at that, and

7 I'm going to ask you if that refreshes your memory at

8 all as to whether or not there were obstructions in

9 the window?

10   A.    Yes.

11   Q.    There were, in fact, obstructions; is that

12 correct?

13   A.    There are, in fact, obstructions, yes.

14   Q.    So in fact, on the side of the store looking

15 in, you can't see inside of the store, can you?

16   A.    Not really.

17       MS. HOFFMAN:  Your Honor, I would object.

18       Speculation.

19       THE COURT:  I'll allow it.

20   Q.    Now, I want to direct your attention to the

21 entrance way of the door here.  You can see there in

22 the photograph that the door is actually at an angle,

23 isn't it, it is not directly south or directly east,

24 it's kind of in a southeasterly direction; is that

25 right?

64

| | |
|---|---|
| 1 | PO T. Wissert #15079 — Defendant — Cross |
| 2 | A.    Yes. |
| 3 | Q.    Now that's, as you walk in, you said once you |
| 4 | got inside of the store, first thing that you saw was |
| 5 | an individual lying in the first aisle? |
| 6 | A.    Yes. |
| 7 | Q.    That's, just so we're clear, that's the, what |
| 8 | you have marked here as Aisle 1; is that correct? |
| 9 | A.    Yes. |
| 10 | Q.    Now, could you see this individual before you |
| 11 | walked in? |
| 12 | A.    No. |
| 13 | Q.    Okay.  And you said that you walked in and |
| 14 | did I hear you correctly, you didn't see the second |
| 15 | individual until after you were leaving; is that |
| 16 | right? |
| 17 | A.    I didn't see the second individual, until I |
| 18 | told the responding officers to leave us, the room. |
| 19 | Q.    Where were you when you first observed him, |
| 20 | the second individual? |
| 21 | A.    I was right by the entrance door. |
| 22 | Q.    Would you just kind of point where. |
| 23 | A.    Where that X is right there. |
| 24 | Q.    X.   Where the X — |
| 25 | A.    Right there.  Yes. |

65

PO T. Wissert #15079 - Defendant - Cross

1

2     Q.     Are there any --

3          THE COURT:  Indicating on the diagram

4          right as you come in the entrance, to the

5          left of the entrance on the diagram as you

6          look at it.

7     Q.     Yes.  When you say "X," I actually see a

8     triangle.

9     A.     Triangle.  Sorry.

10    Q.     That's okay.

11    A.     Be a bad X.

12    Q.     Now, are there any obstructions, or is there

13    anything right here kind of built up on the counter;

14    this is a counter top, correct?

15    A.     Yes.

16    Q.     Is there anything on the counter top right

17    here?

18    A.     I believe there was a door on there.

19    Q.     A door?

20    A.     If I can remember correctly, you had to go

21    underneath to get to the body behind the counter, like

22    a --

23    Q.     Glass door.

24    A.     Yes.  I guess it was to protect them from

25    someone coming in.

66

PO T. Wissert #15079 – Defendant – Cross

Q.     Were there cigarettes or candy or things
stacked up there?

A.     I don't really remember.

    THE COURT:  Area she's talking about on
the diagram is part of the counter that
you --

    MR. BARKET:  Right here.

    THE COURT:  (Continuing) -- that you see
as you come through the entrance of the door
right, right to the right of the entrance --

    MR. BARKET:  Yes.

    THE COURT:  (Continuing) -- as you walked
into the store.

Q.     As you're looking at it just to the left,
right, of the triangle?

A.     It's not clearly visible.  There was
something that blocked it.

    MR. BARKET:  Okay.  Could I have this
second photograph we have here marked as
Defendant's B for identification, please.

    THE COURT:  Go ahead.

    (DEFENDANT'S EXHIBIT B MARKED FOR
IDENTIFICATION.)

    THE COURT:  Show it to the witness.

67

PO T. Wissert #15079 — Defendant — Cross

1

2          MS. HOFFMAN:  We don't have an objection

3      to this.

4          THE COURT:  What is that?  Let her

5      identify that.  What is that a photo of, tell

6      the jurors?

7          THE WITNESS:  It's the counter.

8          THE COURT:  Inside the store?

9          THE WITNESS:  Inside store.

10         THE COURT:  Mark it Defense Exhibit B and

11     show it to the jurors.

12         MR. BARKET:  Before you do that, Judge,

13     could I ask a couple questions; I want to

14     clarify what the area of the counter it is?

15         THE COURT:  Certainly.  Mark it in

16     evidence.

17         MR. BARKET:  Sure.

18         (DEFENDANT'S EXHIBIT B MARKED IN

19     EVIDENCE.)

20         COURT OFFICER:  (Handing.)

21         THE COURT:  You may proceed.

22         MR. BARKET:  Can I approach the witness,

23     Judge?

24         THE COURT:  Yes.

25  Q.   Officer, I wanted to ask you a couple of

1          PO T. Wissert #15079 — Defendant —

2     questions about the photograph.

3     A.     Sure.

4     Q.     As you are looking at the photograp , what is

5     the picture, it's a picture of, it's of the counter

6     area and including this little, this little spot here

7     just to the left of the triangle; is that right?

8     A.     Okay.

9     Q.     So you can see here the items that are

10    stacked up there, cigarettes and candy and things like

11    that?

12    A.     Yes.

13    Q.     Okay.  And they would have been stacked up

14    right along here; is that right?

15    A.     I believe it's in front.  I believe that's a

16    view of the front, kind of like towards the right of

17    the ice cream.  I don't believe that that was the side

18    view of where I saw the deceased laying.

19    Q.     That's not what I'm concerned about.

20    A.     Okay.

21    Q.     It's a photograph of, it says "meat" and "ice

22    cream" and there's a freezer, you can see that here;

23    right?

24    A.     Yes.

25    Q.     And then there's a counter top, correct?

```
 1              PO T. Wissert #15079 – Defendant – C

 2      A.      Right.

 3      Q.      And then on that counter top, towa

 4   right, are the stacks of candies and cigarettes and

 5   pop box, so on, so forth?

 6      A.      Yes.

 7      Q.      These were all there when you arrived, these

 8   items, you didn't move anything around?

 9      A.      That's correct.

10      Q.      When you walked in here, into the entrance

11   way, you don't have a view to the right, you end up

12   looking at these items here; is that correct?

13      A.      Correct.

14              MR. BARKET:  Could we have that shown to

15              the jury, please.

16              THE COURT:  Yes.  Officer, show it to the

17              jury, please.

18              (WHEREUPON, AT THIS POINT, DEFENDANT'S

19              EXHIBIT B WAS PUBLISHED TO THE JURY.)

20              THE COURT:  Okay.  It's been published.

21      Q.      Thank you.

22              Now, Officer, on the diagram itself, I have

23   a, I guess I have a smaller copy here.  Thank you.  On

24   the diagram itself there are measurements indicated

25   there, do you see that I'm looking at now -- not the
```

70

PO T. Wissert #15079 – Defendant – Cross

1

2     photograph.  I'm sorry.  Looking at People's 1.

3     A.      Okay.

4     Q.      Do you see that that has measurements?

5     A.      Correct.

6     Q.      Okay.  And how far is it, according to the

7     diagram, from the easterly wall of the store, all the

8     way across the counter to where the counter ends; do

9     you see where I'm referring to?

10    A.      Eighteen feet.

11    Q.      Eighteen feet, five inches, I believe, right?

12    A.      I don't see five inches.  I see eighteen

13    feet.

14            COURT OFFICER:  Help you out here.  This

15            it here?

16            MR. BARKET:  Yes.

17            THE WITNESS:  Yes.

18    Q.      Eighteen feet, five inches.

19    A.      Yes.

20    Q.      How far is it, the opening, do we know how

21    far the opening is and by "the opening" I mean this

22    area right in here, Officer, from the edge of the

23    counter top, I guess, it would be the easterly edge of

24    the counter top below the triangle to the easterly

25    wall?

PO T. Wissert #15079 – Defendant – Cro

1

2     A.     You want me to take a guess?

3     Q.     No, I don't want you to take a guess; __ you

4     can give us an estimation?

5            MS. HOFFMAN:   Judge, I would ask the

6            witness not guess, unless she knows.

7     Q.     So do I.  If you don't know, you don't know.

8     A.     I don't know.

9     Q.     When you walked in to the store, do you

10    remember how far in it was that you had walk passed

11    the counter top; in other words, how many feet to the

12    north does the counter top end, do you know; is that a

13    couple feet, five feet, do you know?

14    A.     I don't know.

15    Q.     I mean, not even looking at the diagram, you

16    do recall walking into the store; right?

17    A.     Yes.

18    Q.     And before you can see to your right down the

19    ice cream aisle there, you have to kind of walk out

20    passed the counter top, right?

21    A.     Right.

22    Q.     Because you don't have a view of the counter

23    top area from the doorway, do you?

24    A.     No.

25    Q.     Because objects are obstructing that area,

72

PO T. Wissert #15079 - Defendant - Cross

1

2      aren't they?

3      A.      Yes.

4      Q.      Okay.  So in order to see the front of the

5      counter top area, for example, where Number 3 is, do

6      you see that, B-3?

7      A.      I see B-3, yes.

8      Q.      Where B-3 is, in order to see that you have

9      to walk in passed the --

10     A.      Counter.

11     Q.      (Continuing) -- passed the counter?  Excuse

12     me.

13     A.      Right.

14     Q.      Could I have some water.  I'm sorry.

15             Do you recall how far that is; three, four,

16     five feet; you don't?

17     A.      No.  Maybe, three feet.  I'd be guessing.

18             THE COURT:  Excuse us one moment.  Switch

19             reporters.

20             (Whereupon, at this point, Harry Cahn,

21             Official Court Reporter, was relieved by Lois

22             Civelia, Official Court Reporter.

23

24

25

h/c        2/7/2000

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1          Wissert - Cross - Barket          73

2     Q.    Now, you said that the door, itself --

3          MR. BARKET:  Can we have Defense 1?

4          (Handed.)

5     Q.    The door, itself, is a glass door, is that correct?

6     A.    That's correct.

7     Q.    But up at eye level it had several stickers on it

8     that obstructs the view into the store, doesn't it?

9     A.    I'd have to see.

10         MS. HOFFMAN:  Judge, the photo speaks for itself.

11         THE COURT:  He can show her the photo.  If it

12     refreshes her memory about that, she can answer.

13         (Witness refers to photograph.)

14    A.    Correct.

15    Q.    Do we know the names of the individuals, of the two

16    persons?  Do you know their names?

17    A.    I have to check my memo book.

18    Q.    Sure, take a look.

19         (Witness refers to documents.)

20    A.    I believe one of the victims was Jesus Martinez and

21    another one was Frankie Rodriguez.

22         THE COURT:  Do you know which was which on the

23     diagram?

24         THE WITNESS:  I believe Frankie Rodriguez was

25     aisle one, I'm not sure.

Wissert - Cross - Barket                    74

2    Q.    So that Mr. Martinez would be the individual behind
3    the counter, is that correct?

4    A.    That's correct.

5    Q.    Okay.  Now, as you walk into that store, is there
6    anything that obstructed your view of Mr. Martinez as you
7    first walked in?

8    A.    I wasn't even going towards that direction.  When I
9    walked in I automatically went to aisle one for some odd
10   strange reason and maybe because out of the corner of my eye
11   I saw the body laying on the floor.

12   Q.    Okay.  Now, you said there was a glass doorway that
13   you had to go under to get behind the counter?

14   A.    There is something there.  I don't really remember
15   if it was a glass door, but I remember there was something
16   there because people had to go under or go over until they
17   opened it.  I don't really remember exactly what it was.

18   Q.    You indicated that you secured the crime scene.
19   Did you touch anything in the store?

20   A.    Negative, no.

21   Q.    Negative means you're fairly sure of that because
22   you know you're not supposed to?

23   A.    The only thing that I touched was Frankie Rodriguez
24   to see if he was alive.

25   Q.    Okay.  In other words, securing a crime scene also

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

2  meant to make sure that any evidence that was there --

3      A.    -- is not touched.

4      Q.    -- is not touched, and it's preserved for

5  fingerprint analysis and so on?

6      A.    Correct.

7      Q.    Was that done in this case?

8      A.    Yes.

9      Q.    In fact, there was on the counter itself, there was

10  a money tray, wasn't there?

11      A.    Correct.

12      Q.    Do you want to take a look at Defense B?  Would

13  that refresh your memory?

14            (Witness refers to exhibit.)

15      A.    Looks like a register.

16      Q.    Okay.  And did you observe that at the time?

17      A.    At what time?

18      Q.    At the time that you were there, that you were in

19  the store?

20      A.    After the boss and the detectives came, yes.

21  Before, no.

22      Q.    Now, you went in the store with --

23      A.    My partner.

24      Q.    Your partner.  You said at that point you searched

25  the store to make sure there was nobody else there besides

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

Wissert - Cross - Barket               76

2  the two individuals that you observed, right?

3      A.    That's correct.

4      Q.    And then you said a number of other police officers

5  came into the store, correct?

6      A.    Two other police officers.

7      Q.    When they came in you asked them to leave?

8      A.    When we realized the two victims were dead or

9  likely.  We told -- yeah, we said, come on, let's go.

10      Q.    And those officers -- Not touching things is part

11  of your training, right?

12      A.    They didn't even make it past us.  They were by the

13  doorway.

14      Q.    They were just by the doorway?

15      A.    Yeah, they didn't even make it past the counter.

16      Q.    Now, when you first got to the scene, outside of

17  the store did you notice anybody?  Was there any individuals

18  out there?

19      A.    One male when we got out of the car.

20      Q.    Did you identify him to find out his name?

21      A.    I believe a detective did.

22      Q.    Could you describe him for us at all?

23      A.    Male black, my height maybe.

24      Q.    Old?  Young?  Facial hair?

25      A.    Older man.  I can't recall anything else.

```
 1                    Wissert - Cross - Barket              77

 2      Q.    It was just one person?

 3      A.    One man.

 4      Q.    That was the only person at the scene at that time?

 5      A.    That's the only person I saw.

 6      Q.    Okay, what time did you arrive?

 7            (Witness refers to documents.)

 8      A.    12:39.

 9      Q.    You looked at your memo book to refresh your memory

10   about that?

11      A.    Yes, I had to look at my memo book.

12      Q.    That's okay.

13            THE COURT:  Please take the child out of the

14        courtroom.  Thank you.  You may proceed.

15            MR. BARKET:  Thank you, Judge.

16      Q.    You say you looked at your memo book.  Did you make

17   that note contemporaneous with when you arrived, you made the

18   note in your memo book, or did you call up later on and check

19   the time with the timekeeper or dispatch?

20      A.    Approximately -- I don't think we called up.  I

21   think we got it from the SPRINT when they run it on the

22   computer, I think that's when we found out.

23      Q.    When you arrived at the scene you radioed in that

24   you were there, right?

25      A.    Right.
```

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1        Wissert - Cross - Barket              78

2    Q.    And that time is maintained, yes?

3    A.    Yes.

4    Q.    And then later on when you're filling out your memo

5 book you check to see when it was that you arrived?

6    A.    Correct.

7    Q.    So, in fact, your memo book reflects what somebody

8 else told you, true?

9    A.    Correct.

10   Q.    And that is the radio calls that come in are all

11 kept in chronological order by time, is that true?

12   A.    Correct, by Central.

13   Q.    You also said you received a call at a certain

14 point in time, is that true?

15   A.    Yes.

16   Q.    What time did you receive the call?

17   A.    12:36.

18   Q.    And, again, you got that time from the same method,

19 true?

20   A.    No.  As soon as we received the call from Central,

21 my job as the operator or the recorder that day is to record

22 the job as soon as I got the job, I record it in my book.

23   Q.    So, you weren't driving then?

24   A.    I never drive.

25   Q.    Where were you when you received the call?

Wissert - Cross - Barket                    79

A.    We were about approximately six blocks away.

Q.    I'm curious as to where.  Do you remember where?

A.    No, I don't remember.

Q.    Do you remember if you're north or south?  Do you remember what route you took to get there?

A.    I don't remember.  I know --

Q.    How did you pull up?

A.    We parked westbound -- we were going westbound on Riverdale because we parked not in front of the entrance, a little east of the entrance on Riverdale.

Q.    Well, isn't Strauss just east of the entranceway?  So, you parked across the street?

A.    I'm sorry, west, west of the entrance on Riverdale.

Q.    So does that indicate you would have been west and not north?  You didn't come down Strauss at all?

A.    No.

Q.    Okay.  Was there any descriptions -- just yes or no -- was there any descriptions of any perpetrators broadcast out when you first got the call?

A.    Can I check my memo book?

Q.    Sure.

        (Witness refers to documents.)

A.    No.

Q.    Now, the bullet fragments you spoke of, or whatever

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1            Wissert - Cross - Barket       80

2  the ballistic evidence that was taken, did you observe that

3  yourself or was your attention drawn to that by the crime

4  scene individual or investigator?

5     A.    I observed it myself.

6     Q.    Did you point it out to him or her?

7     A.    No, I was just in the store at the time when they

8  found it and when they were vouchering, they put it in an

9  envelope.

10     Q.    So, you saw them find it, essentially?

11     A.    Right.

12     Q.    You didn't observe it like when you were walking

13  around the store, you didn't observe it and say to them, here

14  it is?

15     A.    No.

16     Q.    Okay, now there were two pieces of evidence, were

17  there not, I think you said, on the voucher?

18     A.    Can I look at the voucher?

19     Q.    Sure.

20         (Whereupon, witness refers to document.)

21     A.    Yes.

22     Q.    And one was labelled B1 and one was B3, is that

23  true?

24     A.    Yeah, correct.

25     Q.    Just so we know what's in the diagram --

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1              Wissert - Cross - Barket              81

2              MR. BARKET:  May I approach?

3              THE COURT:  Yes.

4     Q.    B1 is right here in aisle three, is that right?

5     A.    Correct.

6     Q.    And B3, that I referred to earlier, that's in front

7  of the counter top, correct?

8     A.    Correct.

9     Q.    Did you observe any of them collect any other

10  evidence that you're aware of?

11    A.    I don't really remember.

12    Q.    That was the only thing that you or your partner

13  vouchered, is that true?

14    A.    I believe we vouchered a lot more, but I believe

15  money, maybe personal property of the two individuals.

16              MR. BARKET:  Thank you, Officer.  I don't have

17         anything else, Judge.

18              THE COURT:  Any redirect?

19              MS. HOFFMAN:  No, sir.

20              THE COURT:  Thank you very much, Officer Wissert,

21         you are excused.  You may step down from the witness

22         stand.

23              (Whereupon, the witness leaves the courtroom.)

24              THE COURT:  Ladies and gentlemen, the attorneys

25         from both sides have entered into a stipulation that

```
1              Wissert - Cross - Barket
2         if Officer Wissert's partner were to testi
3         trial, Police Officer Coluciello, that he would te..
4         you that on the day after this incident he went to
5         the morgue and identified two individuals at the
6         morgue as the same two individuals that were found in
7         the store, Mr. Jesus Martinez and Mr. Frankie
8         Rodriguez.  Those bodies were identified by that
9         officer as the same ones that were at the grocery
10        store.
11             There is no dispute about that.  You may accept
12        that as evidence in this case.
13             People may proceed.
14             MS. HOFFMAN:  People call Steven Green.
15             THE CLERK:  Step up, raise your right hand,
16        please.
17  S T E V E N   G R E E N   , called as a witness on behalf of
18        the People, having been first duly sworn by the Clerk
19        of the Court, upon being examined, testified as
20        follows:
21             THE CLERK:  Try to speak directly into the
22        microphone.
23             State your name.
24             THE WITNESS:  Steven Green.
25             THE CLERK:  What county do you live in?
```

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040